*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MEMBERSELECT INSURANCE CO,

Plaintiff-Appellant,

v

JOSEPH JOHN RICH, ROLAND AUSTIN, and
RYAN PHILLIPS, as personal representative of the
ESTATE OF ALEX BRADLEE PATRICK,

Defendants-Appellees.

UNPUBLISHED
March 21, 2024

No. 364658
Jackson Circuit Court
LC No. 22-001369-CZ

Before: M. J. KELLY, P.J., and BOONSTRA and CAMERON, JJ.

PER CURIAM.

Plaintiff, MemberSelect Insurance Company (MemberSelect), appeals by right the trial court's order granting defendants' motion for summary disposition and denying MemberSelect's motion for summary disposition. We reverse and remand for entry of an order granting MemberSelect's motion for summary disposition and denying defendants' motion, and for further proceedings not inconsistent with this opinion.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

On February 26, 2021, defendant Joseph Rich (Joseph) went to the home of his mother, Jacqueline Rich (Jacqueline), to visit his daughter, who lived with Jacqueline. While Jacqueline was lying down for a nap, Joseph took her car keys from her purse and drove off in Jacqueline's GMC Envoy, which was insured by MemberSelect. Joseph picked up passengers, Roland Austin and Alex Patrick. Later that night, the GMC Envoy was involved in a motor vehicle accident that killed Patrick and seriously injured Austin; Joseph was later charged with operating a motor vehicle while intoxicated causing death and serious injury. When Jacqueline woke up and noticed that her vehicle was gone, she called the police, who informed her of the accident.

Both Joseph and Jacqueline underwent an examination under oath (EOU) in June 2021. At his EOU, Joseph claimed to not have a current address, but gave an address where he was then staying, stating that he had been staying with a friend for "a couple of weeks now." When asked where he was living before that, he stated that he was "homeless basically" and that he stayed at

-1-

different friends' houses; when asked if there was a place he always went back to, he answered "No." Joseph stated that at the time of the accident he was "homeless" and had just come back from "rehab" in Columbus, Ohio. He denied having an address at the time of the accident, stating that Jacqueline's address was his "mailing address" but not his "living address." When asked if he went back to his mother's house if he was unable to find a place to stay, Joseph again said no, stating that, by court order, he was not allowed at Jacqueline's house except to visit his children because "some stuff happened with CPS and I had to go get clean and stuff and off of drugs[.]" Joseph explained that he had begun having visitations with his children at his mother's house about four years ago and that one of his children lived with Jacqueline; he added that the visitations were on a weekly basis. This restriction was put into place about three years ago. Joseph stated that he had not had a residence in ten years.

Joseph's driver's license listed Jacqueline's address as his address. He denied that any of the utility bills for Jacqueline's home were in his name. He stated that he did not keep personal items at Jacqueline's home. He did not receive government benefits at Jacqueline's address and had listed his address as "homeless" when applying for food assistance. Jacqueline did pay for his cellular phone service and phone, but did not otherwise support him financially. Joseph did not mow the lawn, shovel snow, or take out the trash at Jacqueline's house. When asked, "If you had to say what your permanent home is what address would it be?," Joseph responded, "I don't have one. It's not a permanent address, that's what I'm saying. I mean I don't have one, I'm homeless, been homeless, look at my record, the DHS [sic], I've been homeless for years."

Joseph stated that Jacqueline had not given him permission to drive her vehicle that night, but stated that he had occasionally used it before the accident. However, he clarified that he had "barely ever" used the vehicle because "my ma is really picky about letting people drive her car" and stated that he had driven her vehicle "maybe two times, if that" before the accident and that he had only driven the vehicle to doctor's appointments when Jacqueline had to work. He stated that he did not tell Jacqueline that he was taking her vehicle and that she did not see him leave the house. Joseph had never given her any money for car payments, repairs, or maintenance.

Jacqueline gave similar testimony during her EOU. Jacqueline stated that Joseph had moved out at the age of 14, had lived with his father since then until his father's death six years ago, and had been homeless for the past six years. She agreed that Joseph came to her house for visitations with his daughter, but that he was not allowed to be there otherwise because of a court order put in place four years ago. She was aware that Joseph used her address as a mailing address and as the address on his driver's license. She stated that Joseph "don't live here" and did not provide any money for household bills or for his daughter; additionally, he did not keep any personal items at her house. Jacqueline did not remember Joseph ever using her vehicle before, and stated that he had never asked permission to use it. Jacqueline stated that she had not given anyone else permission to drive her vehicle before the accident. Jacqueline recounted that she actually had to prove to MemberSelect that Joseph did *not* reside with her in order to make sure that he was not added to the policy as a driver. She stated that she gave MemberSelect "a paper" that proved Joseph did not live with her.

Jacqueline specifically stated that she had not given Joseph permission to drive her vehicle on the day of the accident. She was not aware that Joseph had taken her vehicle until she noticed that it was gone and called the police, who informed her of the accident and that the vehicle had

been impounded.  She stated that she did not report the vehicle stolen because the police told her that they had it in their possession.

In November 2021, Austin and the estate of Patrick both filed suit against Joseph and Jacqueline, alleging that Joseph's negligence had caused Austin's injuries and Patrick's death.  In February 2022, MemberSelect initiated this case by filing a complaint for declaratory relief, seeking a declaration that Joseph was not covered by Jacqueline's policy and that MemberSelect therefore owed him no duty to defend or indemnify him against the claims made by Austin and the estate of Patrick.  Specifically, MemberSelect alleged that Joseph did not own the vehicle insured under the policy, was not a named insured on the policy, and did not reside/was not domiciled with Jacqueline and was accordingly not a resident relative under the policy.  Additionally, MemberSelect alleged that Joseph did not have express or implied permission from Jacqueline to drive her vehicle.

Defendants Austin and the estate of Patrick moved for summary disposition, arguing that there was no genuine issue of material fact regarding whether Joseph was entitled to coverage under MemberSelect's policy, either as a resident relative or as a person given permission to drive the vehicle by the vehicle's owner.  MemberSelect also moved for summary disposition, arguing that there was no genuine issue of material fact regarding whether Joseph was entitled to coverage under the policy.

A hearing on the cross-motions for summary disposition was held in December 2022.  After hearing the parties' arguments, the trial court stated in relevant part:

> Now here, we have a situation where Mr. Rich doesn't—clearly does not have a permanent residence that he looks to as his residence anywhere.  But the one constant is his mother's home.  That's the address that he uses, that's who he told the police officers—gave as his address when he was investigated.  He was even— a relatively short time before the accident—listed as a named insured on the policy. I think here the *Rossman*[n][1] reasoning would apply in this case that indeed, Mr. Rich's domicile, which is the language of the policy, is at his mother's home.  But also with respect to the issue of—of consent, I think the facts simply don't overcome the presumption that he used this vehicle with implied consent.  If—if his driving this vehicle—even as sporadically as the evidence shows it happened— was a problem for his mother, it would have been a very easy thing for her to take precautions.
>
> And I realize he's an adult child, but when you have kids in the home that like to take vehicles without permission, you make sure they can't.  You put the keys where they can't find them.  Because certainly there's a risk that the vehicle is gonna be used.  There's—there's no evidence that she took any precaution whatsoever.  So I don't think the evidence is sufficient to overcome the presumption so I'm gonna grant summary disposition to the defendants and against the plaintiff

---

[1] *Rossmann v Titan Ins Co*, unpublished opinion per curiam of the Court of Appeals, issued May 15, 2012 (Docket No. 302720).

-3-

on both issues[,] whether the vehicle was used with permission and the issue of whether he was domiciled in the mother's home.

The trial court entered an order consistent with its ruling. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews de novo a ruling on a motion for summary disposition. *Fowler v Auto Club Ins Ass'n*, 254 Mich App 362, 363; 656 NW2d 856 (2002). MCR 2.116(C)(10) provides that the moving party is entitled to summary disposition if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. The trial court and this Court must view the pleadings and other documentary evidence in the light most favorable to the nonmovant in determining whether a genuine issue of material fact exists. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996), citing MCR 2.116(G)(5). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

We review de novo issues of law, such as the interpretation and application of statutes to undisputed facts. *Eggleston v Bio-Med Apps of Detroit, Inc*, 468 Mich 29, 32; 658 NW2d 139 (2003). "Generally, the determination of domicile is a question of fact. However, where . . . the underlying facts are not in dispute, domicile is a question of law for the court." *Fowler*, 254 Mich App at 364 (citations omitted); see also *Dairyland Ins Co v Auto Owners Ins Co*, 123 Mich App 675, ;333 NW2d 322 (1983) (stating that "the determination of domicile is a question of fact for trial court resolution"). Generally, where the underlying facts are not disputed, the existence of consent under the owner's liability statute is a question of law. *Bieszck v Avis Rent-A-Car System, Inc*, 459 Mich 9, 19 n 8; 583 NW2d 691 (1998).

We review de novo issues of statutory interpretation. *Eggleston v Bio-Med Apps of Detroit, Inc*, 468 Mich 29, 32; 658 NW2d 139 (2003).

## III. DOMICILE

MemberSelect argues that the trial court erred by holding that, for the purposes of the no-fault act, Joseph was domiciled at Jacqueline's home. We agree.

MCL 500.3114 states in pertinent part:

(1) [A] personal protection insurance policy . . . applies to accidental bodily injury to the person named in the policy, the person's spouse, and a relative of either domiciled in the same household, if the injury arises from a motor vehicle accident. . . .

The MemberSelect policy at issue defines an "insured person" under the policy as including a "resident relative" of the named insured, and defines "resident relative" as a person domiciled in the household of the named insured related to them by blood, marriage, or adoption, or who is a foster child. Because it undisputed that Joseph is Jacqueline's son, the MemberSelect policy would apply to him if he were determined to be domiciled in her household.

"The term 'domicile' . . . has a precise, technical meaning in Michigan's common law, and thus must be understood according to that particular meaning." *Grange Insurance Co of Michigan v Lawrence*, 494 Mich 475, 493; 835 NW2d 363 (2013). This definition encompasses both: (1) "the place where a person has his true, fixed, permanent home, and principal establishment, and to which, whenever he is absent, he has the intention of returning," and (2) "that place where a person has voluntarily fixed his abode not for a mere special or temporary purpose, but with a present intention of making it his home, either permanently or for an indefinite or unlimited length of time." *Id.* (quotation marks and citations omitted). At all times, every person has one, and only one, domicile. *Id.* at 493-494. Therefore, "the acquisition of a new domicile does, at the same instant, terminate the preceding one." *Id.* at 494. Further, "domicile is acquired by the combination of residence and the intention to reside in a given place . . . . The traditional common-law inquiry into a person's 'domicile,' then, is generally a question of intent, but also considers all the facts and circumstances taken together." *Id.* at 495 (quotation marks and citations omitted).

Our Supreme Court, in *Workman v Detroit Auto Inter-Insurance Exchange*, 404 Mich 477; 274 NW2d 373 (1979), identified several factors to be considered by a trial court, if relevant, when determining a person's domicile:

(1) [T]he subjective or declared intent of the person of remaining, either permanently or for an indefinite or unlimited length of time, in the place he contends is his "domicile" or "household"; (2) the formality or informality of the relationship between the person and the members of the household; (3) whether the place where the person lives is in the same house, within the same curtilage or upon the same premises; (4) the existence of another place of lodging by the person alleging "residence" or "domicile" in the household. [*Workman*, 404 Mich at 496-497 (citations omitted).]

In addition, this Court has set forth several additional factors to be considered if relevant to the trial court's determination regarding a person's domicile. These factors are commonly cited when determining whether an adult child remains domiciled with their parent or parents, and include:

(1) [T]he person's mailing address; (2) whether the person maintains possessions at the insured's home; (3) whether the insured's address appears on the person's driver's license and other documents; (4) whether a bedroom is maintained for the person at the insured's home; and (5) whether the person is dependent upon the insured for financial support or assistance. [*Williams v State Farm Mut Auto Ins Co*, 202 Mich App 491, 494-495; 509 NW2d 821 (1993), citing *Dairyland Ins Co v Auto-Owners Ins Co*, 123 Mich App 675, 682; 333 NW2d 322 (1983).]

In applying these multifactor tests, our Supreme Court has stated: "[N]o one factor is, in itself, determinative; instead, each factor must be balanced and weighed with the others." *Workman*, 404 Mich at 496.

In this case, the trial court made the following findings in support of its conclusion that Joseph's domicile was his mother's house: that the "one constant" in his life was his mother's house, that he used the address as a mailing address and gave it to the police after the accident, and

that he was listed as a resident relative on Jacqueline's MemberSelect policy until recently. We conclude that these findings do not compel the conclusion the trial court reached.

Jacqueline testified that Joseph had last lived with her when he was fourteen years old, at which point he lived with his father until his father passed away six years ago. She in fact specifically stated that Joseph had never even slept at the house after the age of fourteen. Joseph testified that he hadn't had a residence for ten years, but also testified that he did not go to his mother's house when he lacked another place to stay. Both parties testified that Joseph was only allowed to visit his mother's home for visitations with his children, and that a court order to that effect had been in place for four years. And while he may have given the police his mother's address after his accident (although Joseph did not testify as such, and the traffic crash report only lists that address along with other information that could be obtained from a driver's license), he testified that he did not use that address when asked to provide one by a hospital or by a government agency. Moreover, although he had used his mother's address to register to vote in the past, the records provided by defendants indicated that he had last updated that registration in 2011. That same record search provided by defendants also provided eight addresses possibly associated with Joseph, seven of which were in Jackson and one of which was in Ohio. Joseph also testified that he worked at the same job from the age of fourteen until approximately seven years ago.

The evidence supports the conclusion that Joseph's domicile changed at age fourteen from his mother's house to his father's. At that point, his previous domicile was terminated. *Grange Insurance Co of Michigan,* 494 Mich at 493. Subsequently, although the record does not establish exactly *where* Joseph's domicile was at the time of the accident, there was no evidence to indicate that he ever reestablished a domicile at his mother's house, apart from his use of that address as a mailing address and address on his driver's license. The trial court was not tasked with determining Joseph's current domicile at the time of the accident; rather, the trial court was required to determine whether or not he was domiciled with Jacqueline. And although the trial court gave weight to the fact that Joseph was recently listed as a resident relative on the MemberSelect policy, Jacqueline testified that she never requested such a listing; rather, it appears to have been done merely because Joseph's driver's license listed that address. In fact, as noted, Jacqueline took affirmative steps to remove him from the policy months before the accident.

Additionally, although the exact details of the court order were not provided to the trial court, Joseph and Jacqueline both stated that Joseph was not allowed to visit Jacqueline's home unless it was for a supervised visit with his children. Even if Joseph's domicile had been his mother's home before the court order was put in place, Joseph's "true, fixed, permanent home and principal establishment" could hardly have been a place from which he was barred by law, nor could he have reasonably had the present intention of making that place his home or intended to return to it whenever he was absent. *Grange*, 494 Mich at 493. Further, our Supreme Court has held, albeit in the context of a minor child's domicile, that a court order may establish or change a domicile for the purposes of the no-fault act, even if that order pertained to other matters, such as child custody. See *id.* at 505-506 ("Just as a person does not have two domiciles, a person likewise does not have a domicile set by operation of law for some purposes and perhaps a different domicile for other purposes—such as for consideration under the no-fault act or any other statute that uses the term 'domicile.' A person's domicile for one purpose is his domicile for all purposes . . . . The Legislature made a deliberate choice in selecting the term 'domiciled' in

Michigan's no-fault act, and where domicile is set by operation of law, that determination must be given full legal effect."). Jacqueline's home therefore could not have been Joseph's legal domicile.

The record further shows that neither Joseph nor Jacqueline considered her house to be his home, or even a place where he could stay in an emergency; further, Joseph was literally prevented from staying at the home by court order. Joseph did not keep any possessions at the house, do any chores, or pay any bills. According to uncontroverted evidence, he had not spent the night at the home in over twenty years. Although there is some evidence to support the trial court's finding, when that evidence is balanced and weighed with the evidence against it, *Workman*, 404 Mich at 496, we conclude that the trial court erred as a matter of law. *Fowler*, 254 Mich App at 364.[2]

## IV. IMPLIED CONSENT

MemberSelect also argues that the trial court erred by holding that MemberSelect had not rebutted the presumption that Joseph took Jacqueline's vehicle with her implied consent. We agree.

The owner's liability statute, MCL 257.401 *et seq*., provides in relevant part:

The owner of a motor vehicle is liable for an injury caused by the negligent operation of the motor vehicle whether the negligence consists of a violation of a statute of this state or the ordinary care standard required by common law. The owner is not liable unless the motor vehicle is being driven with his or her express or implied consent or knowledge. It is presumed that the motor vehicle is being driven with the knowledge and consent of the owner if it is driven at the time of the injury by his or her spouse, father, mother, brother, sister, son, daughter, or other immediate member of the family. [MCL 257.401(1).]

Accordingly, the operation of a motor vehicle by a member of the owner's immediate family gives rise to a rebuttable presumption of knowledge and consent. See *Bieszck*, 459 Mich at 18 and n 7. This presumption is not conclusive; it may be rebutted with "positive, unequivocal, strong and credible evidence." *Id.* at 19 (citations omitted).

---

[2] Our unpublished opinion in *Rossmann* does not compel a different result. In addition to its nonbinding nature, MCR 7.215(C)(1), in *Rossmann* the plaintiff not only used his father's home as a mailing address, but kept possessions at his father's house and had an area set aside for his use, which his father described as "pretty much an apartment." *Rossmann*, unpub op at 5. Further, the plaintiff in *Rossman* had periodically stayed at his father's house and had stayed there relatively recently. *Id.* at 5. Our decision in *Rossman* was based on our decision in *Dobson v Maki*, 184 Mich App 244, 253-254; 457 NW2d 132 (1990), in which we noted that the insured's son had not only used his father's home as a mailing address, but had slept at the home recently, did his laundry and ate food there, and considered himself to "officially" reside at his father's home despite often sleeping elsewhere. For the same reasons as *Rossmann*, *Dobson* is distinguishable from this case; in any event, *Dobson* is also not binding on this Court, see MCR 7.215(J)(1).

In this case, the parties do not dispute that Joseph is a member of Jacqueline's immediate family, or that Jacqueline owned the GMC Envoy that Joseph took. Additionally, strong and unchallenged evidence was presented that Jacqueline had no knowledge that Joseph was driving her vehicle—Joseph testified that he took the keys while his mother was sleeping in the other room; he did not ask her permission or inform her that he was taking the keys, borrowing her vehicle, or even leaving the house. Jacqueline testified that she was unaware that Joseph had taken the vehicle, leading her to call the police about the missing vehicle when she awoke. Further, both Joseph and Jacqueline testified that he had not been given express permission to use the vehicle that night. Therefore, the statutory presumption found in MCL 257.401(1) was rebutted with respect to Jacqueline's knowledge and express consent.

Regarding implied consent, the trial court found that Joseph had driven Jacqueline's vehicle "sporadically" in the past and that Jacqueline had nonetheless failed to take "precautions" to keep Joseph from taking the keys, and on the basis of these findings concluded that MemberSelect had not rebutted the statutory presumption of implied consent. We disagree with the trial court's reasoning.

Joseph testified that he had driven his mother's vehicle "maybe twice" before the day of the accident, and that on those instances he had only driven to doctor's appointments when his mother was unavailable to take him due to work. Joseph testified that he could not remember the last time that he drove the vehicle, and that his mother was "picky" about other people driving it. Jacqueline could not recall another time that Joseph had driven her vehicle, but stated that she had never given anyone else permission to use it on a regular basis. Moreover, Jacqueline testified that one set of keys for the vehicle was locked in her bedroom, while the other was in her purse. In other words, the keys to the vehicle were in a private area of the home or inside a bag used to carry personal items—Jacqueline had no reason to expect that her adult son would go rummaging through either her bedroom or her purse in search of car keys, especially when the evidence shows that, at best, Joseph had driven her vehicle twice before (without permission), to established medical appointments while Jacqueline was at work.

Our Supreme Court has noted that, in owner's liability cases, "[t]he driver-defendant is almost always beholden to the owner-defendant. After all, his negligence got them both into the litigation. The driver-defendant's inclination to support the owner's testimony is strong. The potential for manufactured testimony is great." *Roberts v Posey*, 386 Mich 656, 662; 194 NW2d 310 (1972). Therefore, the testimony of Joseph and Jacqueline, standing alone, might arguably be insufficiently unequivocal, strong or credible to rebut the presumption of consent. *Bieszck*, 459 Mich at 19. But in this case, that testimony is supported by two additional objective facts.

The first such fact is that Jacqueline called the police immediately upon discovering that her vehicle was missing. While defendants argue that Jacqueline "never reported the vehicle stolen," she testified during her examination that she was never given the chance to do so, because the police informed her that her vehicle had been in an accident, was impounded, and that an investigation was ongoing. In *Roberts*, our Supreme Court found that the facts presented to the trial court indicated that the defendant had attempted to have his car voluntarily returned by plaintiff rather than reporting it stolen, going so far as to wait a day in order to see if his car was returned rather than report it stolen immediately. *Roberts*, 386 Mich at 662. The Supreme Court held that the presumption of consent is not "overcome by evidence of good faith efforts to get the

vehicle returned voluntarily by the driver." *Id.* at 665. Unlike in *Roberts*, Jacqueline did not wait any length of time to see if her vehicle would be returned voluntarily. Rather, she immediately called the police to report the matter. Although she never made a formal report that the vehicle was stolen, her uncontroverted testimony was that she believed that she was not able to do so once the police had informed her that they had her vehicle and there had been an accident.

The second, and more important, fact is that Jacqueline had, with some amount of effort and annoyance, recently removed Joseph as a member of her household and potential driver listed on her auto insurance policy. Even if Jacqueline had expressly or impliedly consented to Joseph's use of the vehicle in the past, her action in removing Joseph from the policy is strong evidence that her consent was revoked and that any future use of the vehicle by Joseph would be without her consent.[3] See *Bieszck*, 459 Mich at 17, citing *Fout v Dietz*, 401 Mich 403; 258 NW2d 53 (1977) (noting that the common-law presumption of consent (applicable to non-relatives) was rebutted where the owner's friend took his car keys after he fell asleep, despite the owner's earlier instruction that no one else drive the vehicle).

Under these circumstances, we conclude that the trial court erred by concluding that MemberSelect had not rebutted the statutory presumption of consent and that therefore, as a matter of law, Jacqueline was liable for Joseph's operation of the vehicle under the owner's liability statute. In the absence of the presumption, defendants have not established a genuine issue of material fact regarding whether Jacqueline consented to the use of her vehicle on the night of the accident. *Fowler*, 254 Mich App at 363.

We reverse the trial court's order denying MemberSelect's motion for summary disposition and granting defendants' motion, and remand for entry of an order granting MemberSelect's motion for summary disposition and denying defendants' motion, and for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Mark T. Boonstra
/s/ Thomas C. Cameron

---

[3] While there was no evidence that Jacqueline explicitly told Joseph he had been removed from the policy, Joseph also testified that he was unaware whether he was listed as a driver on the policy. In other words, there is no evidence that Joseph was under the belief, based on past information, that he *was* listed on the policy at the time he took the vehicle; rather, it seems that he never knew, or possibly never even wondered, whether he had ever been listed on the policy.